15 MISC 191

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 45(d)(2)(B)(i), Plaintiff Sonoma County Association of Retired Employees (SCARE) moves this Court for an order compelling non-party Towers Watson ("Towers")[1] to produce materials in compliance with a subpoena issued in an *SCARE v. Sonoma County*, No. 09-4432 CW (N.D. Cal.). Towers, an international, for-profit consulting firm, has refused to produce electronically stored information ("ESI") unless SCARE, a non-profit membership organization of retired public employees, pays the exorbitant costs of a discretionary review process to search for hypothetical confidential information that *might* appear in the relevant documents. This Court has ordered Towers to pay similar costs before, on the principle that a party conducting a confidentiality or privilege review controls the associated costs, and should therefore pay them. *Fleisher v. Phoenix Life Ins. Co.*, 2013 WL 42374, at *5 (S.D.N.Y. Jan. 3, 2013). In keeping with that ruling, SCARE asks the Court to order Towers to comply with the subpoena immediately by either (1) producing the documents pursuant to a procedure SCARE proposed months ago as a method of protecting possible confidential material, or (2) conducting the pre-production review but paying the costs itself.

## II. BACKGROUND

**A. Factual Background.**

SCARE brought the underlying action against Sonoma County, California (the "County") in the Northern District of California in September 2009. *Sonoma County Ass'n of Retired Employees v. Sonoma County*, 2015 WL 1870841, at *1 (N.D. Cal. Apr. 23, 2015). SCARE's principal allegations are set forth in its pending motion for partial summary judgment. *See Sonoma County Ass'n of Retired Employees v. Sonoma County*, No. 09-4432 CW (N.D. Cal. May 28, 2015), ECF No. 166. To summarize, SCARE contends that the County promised its employees as far back as 1964 that it would provide them with the same contributions to medical

---

[1] Towers Perrin, a consultant to the County, was subsumed by merger into Towers Watson in 2010.

2

benefits as retirees that it provided to active employees. *See id.* From 1989 on, this promise was enshrined in collective bargaining agreements, known as Memoranda of Understanding (MOUs), with the County's various employee unions. *See id.* However, in 2008, concerned with the perceived cost of funding retiree medical benefits as a result of new accounting standards, the County took steps to drastically cut back its contributions to retiree medical benefits. *See id.* In particular, as a way of trying to get around the "tie" to active employees, the County cut its contributions to both retirees' and active employees' medical benefits from 85% of the premium for the lowest cost plan offered by the County to a flat $500, while simultaneously giving active employees $600 in cash, nominally to use as they saw fit but in actuality designed to evade the County's obligations. *See id.*

Towers is a consulting firm that provided actuarial services to the County from 2002 to 2008. *See* Ex. 1[2] (SONOMA-H-184592-96 at SONOMA-H-184594) (2002 document discussing Towers analysis); Ex. 2 (SONOMA-H-039574-76 at SONOMA-H-039575) (December 2007 discussion of Towers's replacement); Ex. 3 (SEGAL00003125-26 at SEGAL00003125) (showing involvement by Towers into early 2008). Its roles included negotiating with insurers regarding plan changes for active employee and retiree medical benefits; making sure the County stayed up to date with changes in the law affecting medical benefits; meeting with a joint labor-management benefits committee (JLMBC) to explain changes in the law, plan changes, and plan choices; costing out medical benefits provided by the County; and reviewing open enrollment materials prepared by the County. *See* Ex. 4 (Alilovich Dep. 29:11-31:21); Ex. 5 (Wertz Dep. 41:21-42:5, 42:15-21, 43:3-14, 44:20-46:6, 48:6-49:10, 51:5-52:9, 55:7-23, 64:21-66:10, 121:20-22, 122:6-123:3, 125:22-126:14); Ex. 6 (Goodrich Dep. 79:17-80:6, 80:24-81:2). Of particular relevance to this litigation, Towers was involved in a years-long process culminating in early 2008 whereby the County considered various options for addressing the cost of its retiree medical benefits, ultimately deciding to drastically cut its contributions for active employees'

---

[2] All exhibits referenced herein are attached to the Declaration of Genevieve Casey filed herewith, unless otherwise noted.

3

and retirees' medical benefits to $500 per month, while simultaneously giving active employees $600 in cash to make up for these cuts. *See generally* Mot. for Part. Summ. J. §§ II.D.2, II.E.1, *Sonoma County Ass'n of Retired Employees v. Sonoma County*, No. 09-4432 CW (N.D. Cal. May 28, 2015); *see also* Ex. 4 (Alilovich Dep. 29:11-31:25); Ex. 7 (Goodrich Dep. Ex. 105 at P008610, P008612) (referencing Towers's work). This shift is the crux of SCARE's case.

Because County emails were automatically purged after 90 days, a policy in place until the County implemented a litigation hold in June 2009, Towers is likely the only source for much ESI related to this shift. *See* Ex. 8 at Nos. 14, 15.

**B.    Procedural History of Towers Subpoena.**

On November 18, 2014, SCARE served Towers with a subpoena requesting documents and communications relating to the provision of health benefits for County retirees. *See* Ex. 9 (Subpoena) Ex. A; Ex. 10 (Proof of Service). Counsel for SCARE and Towers met and conferred over Towers's objections to the subpoena for months, attempting to compromise by narrowing the subpoena's scope and limiting the costs associated with compliance, with the sole remaining item in dispute being the production of responsive ESI.[3] In January 2015, counsel for SCARE provided Towers with a list of employees and search terms designed to return relevant results among all the potentially responsive ESI. Ex. 11; *see also* Ex. 19 (modifying one search term at Towers's request). In February, Towers provided SCARE with a commercial vendor's estimate of $19,458.88 to prepare the ESI for production, including $2,084.38 to process the documents and $17,374.50[4] for a review to "extract personal information, protected health information, client confidential information, and proprietary information from documents." Exs. 12, 13.

On March 5, SCARE proposed that Towers's concerns about confidential information could be satisfied by the following process (the "March 5 proposal"): Towers would produce the

---

[3] For example, by agreement between the parties, SCARE inspected Towers's hard copy records in February 2015 and selected those it wished Towers to produce. *See* Casey Decl. ¶ 20. At Towers's insistence, SCARE scanned and processed the documents for production at its own expense. *See id.*
[4] The estimated total included $15,672 in hourly review costs plus $1,702.50 for data hosting to facilitate the review.

4

results of the searches SCARE had provided, with all documents marked CONFIDENTIAL pursuant to the protective order in the case; SCARE would review them and identify to Towers those it intended to use in the litigation; and Towers would then take any final steps (such as redaction) it considered necessary to protect confidential information actually found in those documents. Ex. 14; *see also* Ex. 15. In addition, on April 17, SCARE offered to pay the $2,084.38 estimated processing costs if Towers accepted SCARE's March 5 proposal. Ex. 16. Towers rejected the March 5 proposal on April 28, insisting that the pre-production "confidentiality" review was necessary to protect its interests and that SCARE must pay the costs. Ex. 17.

After further meet and confer, the parties reached impasse, Towers having once again asserted on May 4 that it would neither produce ESI pursuant to the March 5 proposal nor assume the costs of its discretionary review. Ex. 18. SCARE now requests that the Court order Towers to produce the ESI, either pursuant to the March 5 proposal or, if Towers still prefers a pre-production review, on a rolling basis, beginning immediately, with Towers to pay all review costs it chooses to incur.

### III.   ARGUMENT

#### A.   Legal Standard

A third party is not protected from every expense or burden associated with complying with a subpoena, but rather from undue expense and burden. *See* Fed. R. Civ. Proc. 45(d)(1). A third party can be required to bear some or all of the expenses of compliance with a subpoena. *In re World Trade Center Disaster Site Litigation*, 2010 WL 3582921, at *1 (S.D.N.Y. Sept. 14, 2010). Requiring the producing party to pay the costs of a discretionary privilege or confidentiality review is appropriate because the producing party controls the associated costs, and "the prudent course is to allocate the costs of discovery in a manner that places the incentive on the parties to focus the production and minimize the costs." *US Bank Nat. Ass'n v. PHL Variable Ins. Co.*, 2012 WL 5395249, at *4 (S.D.N.Y. Nov. 5, 2012); *see also Fleisher*, 2013 WL 42374, at *5 (ordering Towers Watson to pay its own review costs incurred in the course of

5

producing subpoenaed documents); *Prescient Acquisition Grp., Inc. v. MJ Publ'g Trust*, 2006 WL 2996645, at *2-3 (S.D.N.Y. Oct. 13,2006) (allocating some of the costs of complying with a subpoena to the producing party because its "choices" to hire attorneys to respond to the subpoena were made in order to protect its "reputational interest").

**B.  Towers Should Either Produce the ESI Pursuant to SCARE's March 5 Proposal, or Pay the Costs of the Discretionary Pre-Production Review**

From the beginning, SCARE has been at pains to minimize the burden on Towers of complying with its subpoena, including by (1) identifying four custodians and a short list of search terms to reduce the volume of ESI sought; (2) paying the costs of Towers's production of paper documents; (3) offering to pay the costs to search and process the ESI for production; and (4) suggesting the March 5 proposal as an effective method of finalizing production quickly while assuaging Towers's confidentiality concerns. Despite these efforts, Towers has insisted that, if it does produce the documents, it must complete an onerous pre-production review paid for by SCARE. Towers has admitted it "is not aware of any privileged materials in [its] collection" and has provided no basis for its assertions that the proposed searches "may still generate nonresponsive documents or documents that are subject to confidentiality obligations." *See* Ex. 18; Ex. 19 (April 8, 2015 Email from M. Wheatley).

Towers has said that "the purpose of the proposed ESI review is to extract personal information, protected health information, client confidential information, and proprietary information of others" and that it has "a reasonable belief that such information . . . will almost certainly be generated by [SCARE's] search terms," but this belief is conjecture. *See* Ex. 17. Towers's insistence that the documents *might* include confidential information justifying an approximately $17,374.50 review process[5] appears unfounded, since, to SCARE's knowledge, Towers had not yet obtained or reviewed even a sample of the documents. In fact, the search terms provided by SCARE were crafted in part to prevent inadvertent production of documents

---

[5] *See* Ex. 13 (review cost estimate), which allots 192 man hours to the review, which is to be conducted by attorneys, project coordinators and consultants compensated at rates of between $51 and $288 per hour.

6

irrelevant to SCARE, such as work done for other Towers clients. In any event, even if there were such information, the March 5 proposal adequately protects it. If Towers nevertheless insists on conducting the review, the associated costs are exactly the kind of discretionary expenses that should not be shifted to the requesting party. *See US Bank*, 2012 WL 5395249, at *4; *Fleisher*, 2013 WL 42374, at *5. While Towers is free to choose to conduct this review, the cost of which Towers can well afford, SCARE, a non-profit association of retired public employees, should not be required to pay for it.

## IV. CONCLUSION

For all of the foregoing reasons, SCARE respectfully requests that the Court compel Towers to comply with the subpoena to produce documents by either (1) paying its own review expenses or (2) producing the documents pursuant to the March 5 proposal. If Towers chooses the latter option, SCARE requests that the Court clarify that Towers is obligated to pay its own costs for any additional time spent on discretionary review once SCARE identifies documents to be used in the litigation. Moreover, given the delays resulting from this dispute, SCARE requests the Court order Towers to begin its production on a rolling basis, immediately.

Dated: June 30, 2015

Respectfully submitted,

By: _____
Bill Lann Lee
LEWIS, FEINBERG,
LEE & JACKSON, P.C.
476 9th Street
Oakland, CA 94607-4048

*Attorneys for Plaintiff*

7