```
F86JSONC                        Teleconference

     UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
     ------------------------------x

     SONOMA COUNTY ASSOCIATION OF
     RETIRED EMPLOYEES,

                    Plaintiff,

               v.                             15 MC 191 LGS

     COUNTY OF SONOMA, et al.,

                    Defendants.

     ------------------------------x
                                              August 6, 2015
                                              11:35 a.m.
     Before:

                    HON. LORNA G. SCHOFIELD,

                                              District Judge


                            APPEARANCES

     LEWIS, FINEBERG, LEE, RENAKER & JACKSON, PC (CA)
          Attorneys for plaintiff
     BY:  DARIN RANAHAN, Esq.
                    Of counsel


     STEVEN PECK
          Attorney for defendant County of Sonoma


     LOWENSTEIN SANDLER, LLP (NJ)
          Attorneys for defendant Towers Watson Delaware, Inc.
     BY:  GAVIN J. ROONEY, Esq.
                    Of counsel


     Also Present:
          PAUL MEYER, In-House Counsel
          Towers Watson Delaware, Inc.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

1          (Teleconference in the Robing Room)
2          THE COURT: Okay. Good morning, counsel. First my
3   apologies. We had several conferences before you and they ran
4   over. Unfortunately, I understand you have been sitting on the
5   phone, so I apologize for that.
6          We're here on the petition of the plaintiff Sonoma
7   County. I am not sure if you're the plaintiff, but, in any
8   event, yes. Well, in any event, this is a petition by Sonoma
9   County Association of Retired Employees to compel Towers
10  Watson, a third party, to comply with a subpoena served on
11  Towers in November 2014. I know that Towers opposes the motion
12  on the ground that it is untimely and also on the ground that
13  the information is irrelevant or duplicative of other documents
14  produced. I know also that Towers Watson asks that to the
15  extent that production is required, that Sonoma County
16  Association be required to bear the costs of production.
17         I don't want to prolong this, but I would like to hear
18  from each side first on the timeliness issue. Let me hear from
19  Mr. Ranahan first.
20         MR. RANAHAN: Sure. So the timeliness issue, as I
21  understand it, was Towers raised the fact that we filed --
22         THE COURT: I am sorry. Let me interrupt you. I
23  should hear from Mr. Rooney first because it is Towers'
24  argument.
25         MR. ROONEY: Yes. Thank you, your Honor.

1            There was a scheduling order answered in the
2   underlying litigation to which the subpoena relates in
3   California by Judge Wilken, and the scheduling order closed
4   fact discovery on June the 23rd.  It did carve a few exceptions
5   to that close of discovery for certain open discovery issues,
6   including possible motions to compel, but the carve-out was
7   explicit to the particular motions to compel, and this was not
8   included within it.
9            The motion here was filed, according to the docket, on
10  the 2nd of July, more than a week later than the close of
11  discovery.  So we think that the motion was clearly filed in
12  derogation of the scheduling order that was entered in
13  California, and this Court should respect that order.
14           There has been no application, to my knowledge, to
15  vary that scheduling order.  There is also no reason why there
16  was a delay in the filing of the motion.  There was a lengthy
17  meet-and-confer process between the parties.  That record is
18  before your Honor.  I think the last word in that
19  meet-and-confer was actually a letter from my client, dated the
20  4th of May, which was two months before the motion was actually
21  filed.  So we think that this motion is untimely and the court,
22  therefore, need not entertain it.
23           THE COURT:  Okay.  Mr. Ranahan, why the time between
24  May 4th and the actual filing of the motion?  Why did it take
25  as long as it did?

1   MR. RANAHAN:  Sure.  So, first, we had a summary
2   judgment motion due May 28th.  So even though the impasse was
3   reached in early May, we were turning our attentions to the
4   summary judgment motion first and foremost.
5   I also had been working on this and was out of the
6   country from May 14th to May 30th, so that the whole month of
7   May was more or less eaten up by that.
8   As for June, actually the county noticed five
9   different depositions in June which I was responsible for
10  defending, and we need time to put together the motion.  So we
11  did that in June and attempted to file it on June 30th to
12  address the points raised by counsel for Towers regarding the
13  fact discovery cutoff.
14  THE COURT:  Could I ask a question about the fact
15  discovery cutoff.  In the discovery order, at least the one
16  that I have, June 30 doesn't appear.  So was there a separate
17  order setting June 30th as the discovery cutoff date?
18  MR. RANAHAN:  That is actually in the Northern
19  District of California local rules, Local Rule 37-3 provides
20  that discovery motions may be filed after the fact discovery
21  cutoff.
22  THE COURT:  No, but what I mean is --
23  MR. RANAHAN:  The fact discovery cutoff --
24  THE COURT:  -- what set June 30th as the cutoff?
25  Oh, I see.  So you're saying the cutoff date for fact

1   discovery was June 23rd, and under the local rules, the date
2   for filing the motion was June 30th.  Is that it?
3           MR. RANAHAN:  Correct.
4           THE COURT:  Go ahead.
5           MR. RANAHAN:  So we're not arguing the carve-out in
6   this stipulation and order applied to this motion.  I agree
7   that that was limited to specific kind of motions.
8           The reason why the motion was filed on July 2nd, we
9   actually attempted to file it on June 30th, and the sequence of
10  events is set out at length in our reply brief and supporting
11  declaration.
12          THE COURT:  Yes.
13          MR. RANAHAN:  We attempted to file it -- excuse me?
14          THE COURT:  I was just saying yes, I understand you
15  tried to file it, but you weren't successful.
16          MR. RANAHAN:  Exactly.  The reason given when we
17  attempted to file it was that it had a printout and a stamped
18  signature rather than the original ink signature itself.  Had
19  we done our research beforehand, looked at the local rules and
20  called the Clerk's Office, at no time did we have any
21  understanding an original ink signature would be required
22  rather than --
23          THE COURT:  I understand it also did not have the
24  correct number or it didn't have the correct number of civil
25  cover sheets that were required to be submitted, so I gather

1    there were two technical problems.
2            MR. RANAHAN:  It actually had the correct number of
3    civil cover sheets.  It had three, but there were three
4    printouts of the scanned signature rather than three original
5    ink signatures.
6            THE COURT:  I see.  Okay.
7            MR. RANAHAN:  An ink signature was required was the
8    only thing we didn't meet, and I think we can attest that is
9    actually a requirement in the first place.
10           THE COURT:  It seems to me that with regard to
11   timeliness, since you did make a good-faith effort to try to
12   file on the 30th, which was the date by which the motion was
13   required to be filed, that timeliness is something that can be
14   excused provided you're really entitled to the discovery.
15           So why don't we turn to whether the information is
16   relevant and whether it can be had other places or obtained
17   other places.  So let me hear from Mr. Rooney on that.
18           MR. ROONEY:  Certainly, your Honor.
19           Let me, first of all, say that of course we are a
20   non-party and I think what the plaintiff is looking for is to
21   get correspondence between my client and the defendant in the
22   case, and obviously the defendant is an obvious source for its
23   copy of that correspondence.  That is one point I would make.
24           Secondly, we have already made a substantial
25   production of documents to the plaintiff, and let me just lay

1    out the background there.  In essence, Towers Watson has an
2    official file or files for the work that it did for the
3    defendant in this case, and that work goes back quite a number
4    of years, I think 2002 to 2007 or 2008, and per Towers Watson's
5    official policy which we provided to the court and Mr. Meyer's
6    supplemental declaration, any substantive correspondence and
7    other materials, is per policy, to be kept in that physical
8    file.  That was about twelve boxes of documents that was
9    produced to the plaintiff back in February.
10             THE COURT:  Here is the question I have, and that is
11   that that policy could be interpreted in different ways.  There
12   are varying degrees of significance, and so I guess the real
13   question is what assurance do we have that anything of any
14   substantive relevance would be in these paper files?
15             How was the policy interpreted?  How strictly was it
16   enforced?  Or was it followed and was there any enforcement of
17   the policy?  All of those are sort of open issues.
18             MR. MEYER:  This is Paul Meyer from Towers Watson.
19   Towers Watson is an actuarial firm.  As an actuarial firm, we
20   have mandatory -- let me --
21             THE REPORTER:  I am having a lot of trouble hearing
22   him.
23             THE COURT:  Here is the problem -- wait, wait, please
24   stop.  The problem is we have a court reporter here, and you're
25   breaking up.  So if you could speak loudly and slowly, maybe

1  the court reporter will be able to understand and hopefully I
2  will as well.
3         MR. MEYER:  As part of our quality control program, we
4  require strict recordkeeping particularly at Towers parent, so
5  that everything you saw on the second page of the record
6  retention schedule is required to be in the files, and as part
7  of that need to enforce it, quality post-work reviews are done
8  in every office on a biannual basis and the contents of files
9  are pulled.  Given the requirement that contents of such
10 deliveries, work favors, client communications, those are not
11 in the file, the office is penalized.  So they have
12 requirements and they're subject to review for the contents
13 that are identified on the second page of the Towers record
14 retention policy.
15         THE COURT:  Let me just hear from Mr. Ranahan because
16 I gather that the issue is really e-mails that may not be in
17 the paper files and that their adversary in the main suit may
18 not have retained.  Mr. Ranahan, why do you think there are any
19 such e-mails?  Why is it worth it for anyone to go through this
20 exercise?
21         MR. RANAHAN:  Sure.  So a few reasons.
22         First, we are going after these e-mails largely
23 because of the county's e-mail destruction policy which was
24 submitted with our opening brief.  The problem with Towers
25 Watson's policy is that, one, it leaves it largely up to the

1  discretion of Towers' employees whether it is significant or
2  substantive.
3           The e-mails that could be relevant to this case may
4  not have been considered significant or substantive at the
5  time.  The bulk of one of the major issues in this case is
6  whether the retiring medical benefits at issue are vested.
7  This issue was not really in dispute for the bulk of the time
8  that Towers was working with the county.  There could be
9  e-mails referencing the county's benefit or the county's life
10 benefits, something that wasn't deemed significant at the time
11 but now is in retrospect.  That is one issue.
12          Two, the policy itself does not actually say anything
13 about printing out the e-mails.  Actually, the policy says that
14 documents are to be retained in paper and electronic files and
15 that the preferred storage media is the electronic files.
16 Really we're going on Mr. Meyer's word.  We haven't had a
17 chance to cross-examine him.
18          There is no evidence that Towers had even looked at a
19 sample of the electronic documents, to cross-check them with
20 the hard copy documents to confirm they were, in fact, printed
21 out.  All we have to go on is Towers' word.
22          These e-mails, we proposed a process for production of
23 these e-mails that protects any confidential information that
24 may or may not be in there.  We think that is sufficient to
25 meet our obligations under Rule 45.

1      MR. ROONEY:  Your Honor, I didn't get a chance before
2  to mention there is also something called a file share.  This
3  is laid out in the papers.  It was, in effect, the electronic
4  equivalent of the paper files or counterpart to the paper files
5  that have already been produced to the plaintiff.  That is a
6  filing system that is particularly to these engagements.  I
7  think the storage of materials electronically that Mr. Ranahan
8  referenced is that.
9      My client was in the process of readying that for
10 producing, for production when the plaintiff revoked its
11 agreement to pay for the vendor expense, simply to produce that
12 which was I think a thousand dollars or less, and so that
13 wasn't produced because they changed their mind about
14 reimbursing our expense for that.
15     The real issue we are talking about is putting aside
16 the file shares that was particular to the projects are the
17 general e-mail files that are kept essentially in a vault of
18 the individuals who worked on the projects, and that included
19 the e-mails on any matter whatsoever that those individuals
20 might have happened to have preserved that were not filed or
21 particular to the engagement.
22     THE COURT:  Let me ask this.
23     How does all this fit in with what is happening in the
24 underlying case?  If discovery is over, I don't want something
25 that I do to interfere with progress or schedule of the case,

1    so tell me what is happening.
2             MR. RANAHAN:  We filed our summary judgment brief in
3    late May.  The Sonoma County filed its cross-motion in late
4    July or mid-July.  Our reply and opposition to the county's
5    cross-motion is due in early September, and their final reply
6    brief is due in either late September or early October, with a
7    hearing in late October, I believe October 29th.
8             Those dates are not going to change based on this.
9    Ideally, we would like to get this information in time to
10   submit with our reply brief and opposition to the county's
11   cross-motion.  If that doesn't happen, we are not going to let
12   this slow down the dispositive motion brief.
13            MR. PECK:  Your Honor, this is Steve Peck representing
14   the defendant in the underlying action.
15            One, this action was filed in 2009.  It has been
16   pending for a long time.  I understood what you said about the
17   late filing, but there was really no reason why, with
18   reasonable diligence, all of these issues shouldn't have been
19   resolved long before the filing was made on the very last day
20   of discovery.
21            Our efforts at this point are to ensure that there are
22   no disruptions in the current schedule which is agreed to and
23   has been stipulated.  There is a stipulated discovery cutoff.
24   I think Mr. Ranahan's recitation of the timeline for
25   dispositive motions, both of which have been filed, theirs and

Case 1:15-mc-00191-P1   Document 21   Filed 08/17/15   Page 12 of 14     12
F86JSONC                        Teleconference

1  ours, is correct.  As I said, part of that same stipulation was
2  the fact discovery cutoff.
3          Mr. Ranahan just mentioned he didn't get a chance to
4  take depositions of any Towers Watson people.  We're just
5  taking their word for it.  Well, they have had six years to
6  pursue both their subpoena and depositions.  We're going to
7  oppose any of them to conduct any discovery beyond what has
8  been pleaded before the discovery cutoff other than what was
9  accepted in the stipulated order.
10          THE COURT:  Well, I understand your comment.  I am not
11 sure that you have standing to make the objection here, but I
12 hear what you're saying and it is certainly helpful to have
13 context.
14          Let me ask this question of Mr. Rooney.  If I were to
15 order the discovery, I have seen your arguments about
16 confidentiality issues which seem legitimate and serious to me
17 and the need to review documents, but if you were to undertake
18 that, how long would it take?
19          MR. ROONEY:  We secured an estimate from a third-party
20 vendor to actually do that, and it is not simply a
21 confidentiality review.  It is also to find out whether the
22 documents are even responsive.  Here we are talking about the
23 generalized non-filed e-mails of certain Towers Watson
24 personnel.
25          I don't recall off the top of my head what the

              SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1   time-frame would be for that third-party vendor to do the
2   review, and since I have Mr. Meyer on the phone, perhaps they
3   can simple if they know that.
4            MR. MEYER:  This is Paul Meyer.
5            In our experience, it takes typically about two weeks
6   to conduct this kind of review, and the reason we have to
7   conduct it in part is, as Mr. Rooney said, we have not only
8   responses, but we have confidentiality obligations we have to
9   enforce which are particularly (Inaudible).
10           For example, we didn't review for responsiveness.
11  Accidentally produced nonresponsive employee sensitive files of
12  another client with more than 500 employees, that would
13  constitute a data breach under California law for which we
14  would have to notify the Attorney General.  We have to take
15  those review obligations very seriously.
16           THE COURT:  Let me not prolong this.  My order is that
17  I will require Towers Watson to comply with the subpoena.
18  However, Towers Watson is a third party here and it seems to me
19  that there is at least some question about how much in the way
20  of relevant information there may be in these documents.
21           So I will require the Sonoma County Association to
22  bear all of the costs of reviewing and producing the documents,
23  and by that I mean the vendor costs and also the attorney
24  costs.  I expect the parties to talk to each other, however, to
25  agree on what will be done so that you don't end up handing a

F86JSONC                    Teleconference

1   bill to Mr. Ranahan for a hundred thousand dollars, I am just
2   saying that hypothetically, at the end of the process.
3            I expect that the parties will work together closely
4   so that, for example, Mr. Ranahan's client can say gee, maybe
5   we don't really need to search as many of these or perhaps only
6   of these custodians or do whatever it thinks is necessary since
7   the work is being done on its dime.  I completely credit the
8   need for not only a relevance review, but also the
9   confidentiality review.
10           Are there any questions about my ruling?
11           Okay.  So I will leave it at that.  I will enter a
12  short written order today to reflect my ruling, and I assume
13  you will proceed from there.
14           Thank you very much, counsel.
15           (Court adjourned)
16
17
18
19
20
21
22
23
24
25